**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CLAUDE WORTHINGTON BENEDUM )
FOUNDATION, a Pennsylvania non-profit )
corporation, )
                                                        )
               Plaintiff, )
                                                        )
       v. )         Civil Action No. 12-1386
                                                        )         Judge Nora Barry Fischer
WILLIAM FRANCIS HARLEY, III, an adult )
individual, FURSA ALTERNATIVE )
STRATEGIES, LLC, a Delaware Limited )
Liability Company, HBS HOLDING )
COMPANY, LLC, a Delaware Limited )
Liability Company, and ARSENAL GROUP, )
LLC, a Delaware Limited Liability Company, )
                                                        )
             Defendants. )

## OPINION

      This is a civil action for conversion, breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation in connection with the management of Plaintiff Claude Worthington Benedum Foundation's (the "Foundation") investment funds. (Docket No. 30). The Foundation claims that Defendant William Francis Harley, III ("Harley") utilized its money for self-interested purposes, failed to report certain large transactions, and refused to honor the Foundation's redemption requests. *Id.* The Foundation implicates Defendants FURSA Alternatives Strategies, LLC ("FURSA"), HBS Holding Company, LLC ("HBS"), and Arsenal Group, LLC ("Arsenal") in Harley's misconduct. *Id.* Pending before the Court is Defendants' "Motion to Dismiss and Motion to Strike Immaterial, Impertinent, and Scandalous Allegations." (Docket No. 33). The Foundation has filed a response opposing both dismissal as well as the motion to strike, (Docket No. 37), to which Defendants have countered

with a reply brief. (Docket No. 38). For the following reasons, Defendants' "Motion to Dismiss and Motion to Strike Immaterial, Impertinent, and Scandalous Allegations" is denied.

## I.     PLAINTIFF'S ALLEGATIONS

The Foundation is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania. (Docket No. 30, at ¶ 1). It maintains sizable investments for the purpose of funding various philanthropic initiatives. In 2004, it placed $2 million in the Mellon HBV Offshore Multi-Strategy Fund Ltd. ("Mellon Fund"), which was then controlled and managed by Mellon HBV Alternative Strategies, LLC, Mellon Holdings LLC (collectively the "Mellon Entities"), and Defendant Harley. *Id.* at ¶ 8. Upon investing, the Foundation was provided with a Side Letter agreement signed by Edward A. Schinik, Chief Operating Officer for the Mellon Fund. *Id.* at ¶ 9. This Side Letter stipulated that "[t]here will be no restriction on the ability of the Foundation to completely withdraw from the Fund" and that if the Foundation elected to partially withdraw, it only needed to maintain a minimum holding of $100,000. *Id.*; (Docket No. 30-1). No amendments were ever made to this Side Letter. (Docket No. 30, at ¶ 10). During this time, Harley was the fund manager responsible for the day-to-day custody and control of the Mellon Fund's assets through his position with the Mellon Entities. *Id.* at ¶ 12.

In late 2006, the Mellon Entities divested themselves of management over the Mellon Fund without explanation. *Id.* at ¶¶ 18-19. While the hedge fund was being spun off, various members of Defendant HBS who possessed claims against Harley and the Mellon Entities were threatening litigation. *Id.* at ¶ 20. At that time, Harley also held a 34.88% interest in HBS. *Id.* at ¶ 22. In order to secure releases from litigation for him and the Mellon Entities, Harley transferred $13.6 to $17.6 million in assets as well as $1.8 million in cash from the hedge fund to HBS. *Id.* at ¶¶ 21-23.

The Foundation claims that on January 19, 2007, it was advised that Harley, through FURSA, had purchased Mellon Holdings LLC and renamed the Mellon Fund to FURSA Offshore Global Event Driven Fund Ltd.[1] *Id.* at ¶ 25. No prior representations concerning a change in control of the Mellon Fund had been provided to the Foundation. *Id.* at ¶ 26. Following this transaction, Harley and FURSA retained exclusive control and custody over the Foundation's assets that were previously invested in the Mellon Fund. *Id.* at ¶ 28. As such, Harley and FURSA had the exclusive responsibility for making all investment and management decisions regarding the Foundation's assets. *Id.* At no time during or after the sale did the Foundation agree to alter or amend the Side Letter. *Id.* at ¶ 27.

Starting in January 2007, FURSA provided monthly updates as to the performance of the Foundation's $2 million investment. *Id.* at ¶ 30. By December 31, 2007, FURSA represented that the investment had grown to over $2.7 million. *Id.* at ¶ 31. In 2008, however, Defendants' fortunes turned and the hedge fund began sustaining heavy losses. It was reported that the Foundation's investment was $2.1 million in January 2008 and $1.78 million in February 2008. *Id.* at ¶¶ 33-34. By the end of March 2008, the value fell to $1.69 million, and FURSA reported that the fund needed to be "rescued." *Id.* at ¶ 38. While the fund was collapsing in February 2008, Harley "caused a payment of $2,626,451 to be made to [HBS]" with regard to the Chinese NPLs[2] that remained titled to the fund and to FURSA, without disclosing said transaction to the Foundation. *Id.* at ¶ 35. Because Harley maintained his 34.99% interest in HBS, the Foundation believes he received approximately $918,995 from this transaction. *Id.* at ¶ 36.

---

[1] As it is alleged that the FURSA Offshore Global Event Driven Fund Ltd. is the successor to the Mellon Fund, the Court will refer to both entities singly or collectively as "the hedge fund."

[2] Plaintiff does not define the term "NPL" in the Second Amended Complaint; however, it is likely that NPL refers to "non-performing loan." A non-performing loan is a loan that has or will likely default. INTERNATIONAL MONETARY FUND, THE TREATMENT OF NONPERFORMING LOANS 7-8 (2005), *available at* http://www.imf.org/external/pubs/ft/bop/2005/05-29.pdf.

No successful rescue effort ever materialized. *Id.* at ¶ 39. By April 30, 2008, the value of the Foundation's investment had plummeted to $306,376.75. *Id.* at ¶ 40. In a meeting allegedly held on June 25, 2008, Harley admitted to the Foundation's financial representative, Dwight Keating, that the hedge fund had been experiencing difficulties since late 2007 and that a number of large investors had made redemption requests to pull out of the fund. *Id.* at ¶¶ 43-44. During this same conversation, the Foundation maintains that Harley represented: (1) he shared material, non-public information with certain large investors in the fund but not the Foundation; (2) he had failed to inform the Foundation about any redemption requests; (3) the fund was to be liquidated, with the Foundation receiving a *pro rata* share of the liquidation assets; (4) because he had failed to previously advise the Foundation about the redemption requests, that it would be treated as if it had made its redemption request in December 2007 rather than later in time; and (5) if the matter had to be taken to court, the Foundation would stand first in line to recover before the other large investors. *Id.* at ¶¶ 45-46, 48.

Following this conversation, Harley and FURSA provided the Foundation with monthly account updates, which advised that the hedge fund was in the process of winding down and liquidating. *Id.* at ¶¶ 51, 56-59, 61-62. On July 9, 2008, Keating formally requested the withdrawal of the Foundation's investment effective December 31, 2007, and Harley acknowledged acceptance of said request. *Id.* at ¶¶ 53-54. The monthly updates continued into June 29, 2009, when Harley and FURSA maintained that the hedge fund's value was approximately $108 million. *Id.* at ¶¶ 61-63.

Sometime after sending the June 29, 2009 account statement, Harley and FURSA abruptly and without prior notice closed FURSA's offices, disconnected the phones, and ceased communications with the Foundation. *Id.* at ¶¶ 66-68, 70. No forwarding address or other contact

information was provided. *Id.* at ¶ 69. It was later discovered that Harley had relocated FURSA to the basement of a Hooter's restaurant that he owned while allegedly continuing to wind down the hedge fund. *Id.* at ¶¶ 72-73.

The hedge fund was never wound down or liquidated. *Id.* at ¶ 80. Rather, the Foundation alleges that Harley and FURSA continued to operate with its money. *Id.* at ¶ 74. More specifically, Harley used the hedge fund's assets to secure appointments to numerous boards, collected income from stock for his own use, and continued to collect a 1.5% annual management fee from the hedge fund. *Id.* at ¶¶ 76, 80. For example, in 2010, Harley established a company in Texas that purchased a pecan farm and acquired over eight million shares of Frederick's of Hollywood ("FOH") stock. *Id.* at ¶ 77-78. No distributions to the Foundation were made. *Id.* at ¶ 80.

In 2011, it is believed that Harley and FURSA transferred assets from FURSA to Arsenal, including the FOH stock. *Id.* at ¶¶ 79, 81. The Foundation contends that Harley completely controls Arsenal and that this transaction was conducted without its consent. *Id.* at ¶¶ 85, 86. At some unknown time, Harley used Arsenal to provide at least $2.8 million to HRK Holdings, LLC ("HRK"), which he had co-founded in February 2006, causing both Harley and Arsenal to take an ownership interest in the company. *Id.* at ¶¶ 14, 92-94. The Foundation charges that the purpose of this transaction was to help pay for efforts to remedy HRK's pollution problem involving the leakage of 170 million gallons of toxic water into Tampa Bay's Bishop Harbor. *Id.* at ¶¶ 89, 94-95.

The Foundation sent Harley correspondence inquiring about its investment in FURSA on May 19, 2011. *Id.* at ¶ 87. This correspondence was allegedly ignored.[3] *Id.* at ¶ 88. As of June

---

[3] Consequently, the Foundation initiated this action in the Allegheny County Court of Common Pleas on June 13, 2011, *id.* at ¶ 90; (Docket No. 37, at 5), which was then removed to the federal court. (Docket No. 1).

2012, the Foundation's investment has dwindled to a value of $125,627.51. (Docket No. 30, at ¶ 118).

## II.    DISCUSSION

Defendants seek to dismiss a number of claims and strike certain pleadings in the Second Amended Complaint based on Rules 12(b)(6) and Rule 12(f) of the Federal Rules of Civil Procedure.[4] (Docket No. 33). As grounds for their Rule 12(b)(6) motion to dismiss, Defendants specifically contend that: (1) the statute of limitations bars the Foundation's claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation; (2) there can be no breach of a fiduciary duty because hedge fund managers owe no fiduciary duty to their investors; and (3) the Foundation has not alleged sufficient facts to establish proximate causation for its fraudulent misrepresentation and negligent misrepresentation claims. *Id.* In addition, Defendants seek to strike multiple portions of the Second Amended Complaint pursuant to Rule 12(f). *Id.* The Foundation urges that the motions be denied. (Docket No. 37). As the matter has been fully briefed, they are now ripe for disposition.

### A.  Federal Rule of Civil Procedure 12(b)(6) Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of a complaint. To survive a motion to dismiss, a complaint must

---

[4] Defendants appear to argue that the Court should dismiss untimely claims on the basis of Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Docket No. 33, at 2; Docket No. 34, at 3). However, a Rule 12(b)(1) motion is appropriate only when the issue is a federal court's "very power to hear the case" as a court of limited jurisdiction. *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). The subject matter jurisdiction of this Court to hear the claims in this case is not implicated by a statute of limitations defense. Indeed, the Supreme Court has recognized that "[i]f the allegations … [in a complaint] show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock*, 549 U.S. 199, 215 (2007). The two cases Defendants reference in support of dismissal pursuant to Rule 12(b)(1) either confirm that the appropriate ground for dismissal is "failure to state a claim on which relief can be granted," *Drabkin v. Gibbs & Hill*, 74 F. Supp. 758, 763 (S.D.N.Y. 1947), or merely discuss the appropriate quantum of proof required before it can be determined that a statutory bar actually precludes recovery. *See Loker v. Allied Bldg. Credits*, 7 F.R.D. 358 (W.D. Mo. 1947). Defendants have also represented that the Court could maintain jurisdiction over this action when removing the case from state court. (Docket No. 1, at ¶ 4). Therefore, the potential statute of limitations bar will be analyzed pursuant to the standard under Rule 12(b)(6).

contain sufficient factual pleadings to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*). This requirement is designed to facilitate the federal notice-pleading standard, which requires "a short and plain statement of [a] claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2) (emphasis added). With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

When ruling on a Rule 12(b)(6) motion, a court must accept as true all well-pleaded facts and allegations and must draw all reasonable inferences therefrom in favor of the plaintiff. *See Iqbal*, 556 U.S. at 678; *see also Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) (explaining that the ultimate determination in a Rule 12(b)(6) analysis is "whether plaintiff may be entitled to relief under any reasonable reading of the complaint"). The Court may consider "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.,* 361 F.3d 217, 222 n.3 (3d Cir. 2004). Nevertheless, a court need not credit bald assertions, unwarranted inference, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The plaintiff's obligation to provide the grounds of his legal entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original). By authorizing dismissal on the basis of some dispositive issue of law, Rule 12(b)(6) dispenses with "needless discovery and factfinding" for the ultimate purpose of streamlining litigation. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

**B.  Analysis of Rule 12(b)(6) Motion**

As noted, Defendants contend that the Foundation's claims for breach of fiduciary duty, fraud, and negligent misrepresentation should be dismissed for failure to state a claim on which relief can be granted. First, they argue that these legal claims are time-barred by Pennsylvania's two-year statute of limitations applicable to such causes of action. (Docket No. 34, at 4-6). Second, Defendants insist that they do not owe the Foundation a legally cognizable fiduciary duty. *Id.* at 7-8. Third, they dispute that any of the alleged injuries sustained by the Foundation were proximately caused by any misrepresentations they allegedly made. *Id.* at 8-12.

With the exception of Defendants' assertion that they owe no fiduciary duty to the Foundation, the parties' arguments rest entirely on Pennsylvania law. (Docket Nos. 34; 37; 38). In addition, the Foundation makes no reference to any federal causes of action in the Second Amended Complaint. (Docket No. 30). Neither party has asserted that the law of any other jurisdiction applies. Accordingly, the Court will apply Pennsylvania law. As to the breach of fiduciary duty claim, however, the Court will address the extent to which federal law may apply.

**1.  The Statute of Limitations Does Not Bar the Foundation's Claims at this Stage.**

The granting of a motion to dismiss may be premised on statute of limitations grounds only if the bar is apparent on the face of the complaint. *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) ("'If the [statute of limitations] bar is not apparent on the face of the complaint, then it may not afford the basis for dismissal of the complaint under Rule 12(b)(6).'")

(quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)). Pursuant to Pennsylvania law, the applicable limitations period for fraudulent misrepresentation, intentional misrepresentation, and breach of fiduciary duty is two years. 42 PA. CONS. STAT. § 5524(7); *see In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 336 (3d Cir. 2004) (citing *Maillie v. Greater Delaware Valley Health Care, Inc.*, 628 A.2d 528, 532 (Pa. Commw. Ct. 1993)).

"In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005) (citing *Kapil v. Ass'n of Pa. State Coll. and Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983)). Ordinarily, a plaintiff's lack of knowledge, mistake, or misunderstanding about all the facts and circumstances that form the basis of a potential legal claim will not toll the statute of limitations. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).

The limitations period is tolled, however, where the plaintiff was unable to ascertain that a cause of action exists despite the exercise of due diligence. *Id.* In such circumstances, the "discovery rule … tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000) (citing *Pearce v. Salvation Army*, 674 A.2d 1123, 1125 (Pa. 1996)). However, "[t]he point at which the complaining party should be reasonably aware that he or she has suffered an injury and its cause is ordinarily an issue of fact to be determined by the jury due to the fact intensive nature of the inquiry." *Gleason v. Borough of Moosic*, 15 A.3d 479, 485 (Pa. 2011) (citing *Wilson v. El-Daief*, 964 A.2d 354, 362 (Pa. 2009)); *accord Crouse*, 745 A.2d at 611 (whether the complaining party was reasonably aware of an injury "is a factual issue 'best determined by the collective judgment, wisdom and experience of jurors'") (quoting *White v.*

*Owens-Corning Fiberglas Corp.*, 668 A.2d 136, 144 (Pa. 1996)). Thus, "only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law." *Id.* (emphasis in original) (citing *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040, 1043 (Pa. 1992)); *see also Onconome, Inc. v. Univ. of Pittsburgh*, No. 09-1195, 2009 WL 5064481, at *14 (W.D. Pa. Dec. 7, 2009) (Schwab, J.) ("Under Pennsylvania law, assertion of fraud or concealment for purposes of tolling statute of limitations must be proved by clear, precise and convincing evidence.") (citing *Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274 (3d Cir. 1991)).

The Foundation filed a writ of summons in state court initiating this action on June 13, 2011. (Docket No. 30, at ¶ 90; Docket No. 34, at 5; Docket No. 37, at 5). Yet, Defendants maintain the Foundation was aware of its alleged misconduct as early as June 25, 2008. They reference the Foundation's allegation that on said date, Harley "confessed that he shared material, non-public information with large investors in the fund, but not the Foundation. And further, that he had not informed the Foundation about any redemption requests." (Docket No. 30, at ¶ 45). They thus argue the claims for breach of fiduciary duty, fraud, and negligent misrepresentation accrued on June 25, 2008, almost three years prior to the time the state court action was initiated. (Docket No. 34, at 6). In response, the Foundation contends that the statute of limitations did not begin running on those claims until Defendants decided to cease communication and abscond with its money. (Docket No. 37, at 5). It claims that this event occurred sometime after June 29, 2009, the date Defendants sent the last of their monthly account updates to the Foundation. (Docket No. 30, at ¶¶ 62, 66; Docket No. 37, at 5). If the statute of limitations began to run after June 29, 2009, these claims would not be barred.

The Court does not find that any of the claims are time-barred at this juncture. Defendants' statute of limitations defense relies on the mistaken premise that the Foundation's breach of fiduciary, negligent misrepresentation, and fraudulent misrepresentation claims are limited in scope to the disclosures made by Harley to Keating on June 25, 2008 regarding his alleged improprieties in his handling of the Fund up to that point, such that the claims accrued on that date. However, taking all of the allegations in the Second Amended Complaint as true, and construing all factual inferences in the plaintiff's favor, as this Court must, it is clear that the Foundation's claims are much broader in scope. To this end, the Foundation alleges, among other things, that Defendants made a series of misrepresentations, either negligent or intentionally fraudulent, and breached their fiduciary duties before and after the initial June 25, 2008 meeting, including at specific instances within the statutory period, i.e., during and after June 2009. (Docket No. 30, at ¶¶ 21-23, 35-36, 42, 45-49, 51, 54, 57-58, 61-62, 64, 71, 76-81, 92-95, 101). While the Foundation admits that Harley disclosed some of his alleged wrongdoing during this meeting, it expressly pleads that he did not and has never disclosed that he was involved in numerous instances of self-dealing both before and after the meeting as described in the Second Amended Complaint. *Id.* at ¶ 47; *see Schwartz v. Pierucci*, 60 B.R. 397, 403 (E.D. Pa. 1986) ("[T]he fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud. Absent a disclosure, the fiduciary commits an act of continual covering up of the fraud."). Despite Harley's promise to make the Foundation whole by liquidating the Fund and giving it priority status during the liquidation, Defendants instead absconded with the money. (Docket No. 30, at ¶¶ 50, 66-70). Defendants also sent monthly email communications to the Foundation misrepresenting the status of its investment and fact that the Fund was in liquidation from the June 2008 meeting until a final email communication

on June 29, 2009. *Id.* at ¶ 62. Of course, the Foundation initiated this case within two years of this final email communication.

In all, the Court finds that the Foundation has set forth sufficient facts from which the Court may plausibly infer that its claims either did not fully accrue until a time within two years of initiating this suit in the Court of Common Pleas or that the statute of limitations may be tolled. This accords with the Court's consistent practice of denying motions to dismiss claims as untimely under Rule 12(b)(6) where the plaintiff has pled sufficient facts from which it can plausibly be inferred that the cause of action either accrued within the relevant statutory period and/or that the statute of limitations should be tolled pursuant to the discovery rule. *See, e.g., Cranberry Promenade, Inc. v. Cranberry Twp.*, No. 09-290, 2010 WL 653915, at *3 (W.D. Pa. Feb. 22, 2010) (RICO claims were not dismissed on statute of limitations grounds given sufficient allegations of wrongdoing by defendants over a lengthy period of time which brought the claims within the statutory period); *Riley v. Medtronic*, No. 10-1071, 2011 WL 3444190, at *5-9 (W.D. Pa. Aug. 8, 2011) (plaintiff pled sufficient facts from which a plausible claim could be made that the statute should be tolled under the discovery rule). Even more scrutiny is applied here given the alleged existence of a principal-fiduciary relationship. *See Schwartz*, 60 B.R. at 403 ("Where a fiduciary commits an act of fraud against his principal, the statute of limitations will be tolled, since the very position the fiduciary is in, prohibits the principal from uncovering the fraud."). As the facts alleged in the Second Amended Complaint do not demonstrate that Plaintiff's claims are clearly barred by the applicable statute of limitations on the face of the complaint, dismissal is not warranted under Third Circuit precedent.[5] *See Robinson*, 313 F.3d at

---

[5] Defendants' citations to cases dismissing claims as time-barred are unavailing because the courts in those instances ruled at the summary judgment stage, where the facts were sufficiently developed to determine that the claimant was on notice of "storm warnings" of possible fraud. *See Onconome*, 2009 WL 5064481, at *7; *Ciccarelli v. Gichner Sys. Grp., Inc.*, 862 F. Supp. 1293, 1295 (M.D. Pa. 1994). As the pending motion is only a motion to

135. Accordingly, Defendants' motion to dismiss is denied, without prejudice, to the renewal of such arguments based on a more fully developed factual record at summary judgment and/or trial.

### 2. The Foundation Has Alleged Sufficient Facts to Set Forth a Claim for Breach of Fiduciary Duty.

The Foundation advances a claim for breach of fiduciary duty against Defendants premised on their alleged self-dealing with respect to the hedge fund assets they managed on the Foundation's behalf. Defendants have moved to dismiss this claim. Before delving into the parties' arguments, some background on hedge funds is necessary. The Court will then address Defendants' contention that they, as hedge fund managers, owe no fiduciary duty to the Foundation, an investor in the hedge fund. Finally, the Court will examine whether sufficient facts have been pled to plausibly infer that the parties shared a fiduciary relationship pursuant to Pennsylvania law.

### a) The Organization and Operation of Hedge Funds.

In the world of investment vehicles, hedge funds are more flexible, less regulated, potentially more profitable, and are generally riskier than other investment funds. The term "hedge fund" describes "any pooled investment vehicle that is privately organized, administered by professional investment managers, and not widely available to the public." PRESIDENT'S WORKING GROUP ON FINANCIAL MARKETS, HEDGE FUNDS, LEVERAGE, AND THE LESSONS OF LONG-TERM CAPITAL MANAGEMENT 1 (1999) ("*PWG Report*"). Traditionally, hedge funds combine "long" positions with "short" positions,[6] allowing them to "hedge" their bets by

---

dismiss pursuant to Rule 12(b)(6), no discovery has occurred and the Court is required to accept all averments in the Second Amended Complaint as true. *See Iqbal*, 556 U.S. at 678.

[6] "Long" positions are bets that an investment will rise. Desmet, *supra*, at 2. "Short" positions are bets that a security's price will fall. *Id.* In order to profit on an anticipated decline in the price of a security, a trader typically engages in "short selling," a strategy involving the sale of borrowed securities in the anticipation of making a profit

minimizing the risk of loss on any one position and generate returns regardless of whether the market rises or falls. Thierry Oliver Desmet, *Understanding Hedge Fund Adviser Regulation*, 4 HASTINGS BUS. L.J. 1, 2-3 (2008). Another defining characteristic of hedge funds is their often aggressive use of leverage, a technique that serves to both amplify any gain as well as magnify the risk of loss. *See PWG Report*, *supra*, at 2, 4. The amount of assets hedge funds manage can vary in size from as little as $5 million to as much as $7 billion. *See* J.W. Verret, *Dr. Jones and the Raiders of Lost Capital: Hedge Fund Regulation, Part II, A Self-Regulation Proposal*, 32 Del. J. Corp. L. 799, 804 (2007); Katherine Burton, *Renaissance Starts First Hedge Fund in Five Years to Trade Stocks, Futures*, BLOOMBERG (Jan. 17, 2012), http://www.bloomberg.com/news/2012-01-17/renaissance-starts-first-hedge-fund-in-five-years-to-trade-stocks-futures.html. Although hedge funds have been in existence since 1949, investment in such funds has exploded in popularity in recent decades. *See PWG Report*, *supra*, at 1; Desmet, *supra*, at 8. In the fourth quarter of the year 2012, approximately $2.3 trillion was invested in hedge funds and funds investing in hedge funds. BARCLAYHEDGE, http://www.barclayhedge.com/research/indices/ghs/mum/HF_Money_Under_Management.html (last visited May 2, 2013).

A hedge fund consists of three basic entities: investors, the fund, and the investment adviser or management company. Houman B. Shadab, *The Law and Economics of Hedge Funds: Financial Innovation and Investor Protection*, 6 BERKELEY BUS. L.J. 240, 247 (2009). Domestic hedge funds are typically structured as limited partnerships or limited liability companies. *Id.* These business associations permit flexibility in governance and provide pass-through taxation benefits. *Id.* at 248-49. Many hedge funds are organized in Delaware because of the state's

by repurchasing these securities at a lower price and at a later date. STEFANO LAVINO, THE HEDGE FUND HANDBOOK: A DEFINITIVE GUIDE FOR ANALYZING AND EVALUATING ALTERNATIVE INVESTMENTS, 1 (2000).

sophisticated laws dealing with business entities as well as its recognition of "side letters," ancillary agreements that allow hedge fund managers to give certain preferred investors individual benefits that are not shared by all the fund's investors. Ryan Sklar, Note, *Hedges or Thickets: Protecting Investors from Hedge Fund Managers' Conflicts of Interest*, 77 FORDHAM L. REV. 3251, 3263 (2009); *see also* ASSET MANAGERS' COMMITTEE, BEST PRACTICES FOR THE HEDGE FUND INDUSTRY 10 (2008).

Under the terms of the applicable hedge fund operating agreement, the fund adviser or management company is compensated with a management fee, ranging from one to two percent of the fund's net asset value, as well as a performance-based fee ranging from fifteen to twenty percent of profits in excess of prior losses and the net of management fees. Shadab, *supra*, at 250. These operating agreements also generally restrict an investor's ability to redeem his or her investment at will and grant the hedge fund manager discretion to bar withdrawals entirely. *Id.* at 251-52.

Hedge funds are typically structured and operated in a way that avoids the extensive regulation that govern its mutual fund counterparts. Specifically, most hedge funds are exempt from regulation under the Investment Company Act of 1940 ("ICA") because they do not typically offer their securities to the public, have less than one hundred beneficial owners, and their investors are typically qualified high net-worth individuals or institutions. *Goldstein v. S.E.C.*, 451 F.3d 873, 875 (D.C. Cir. 2006). These hedge funds do not need to observe ICA registration and reporting requirements or regulatory restrictions on leverage. *Id.* They can also take on significant debt without approval and are able to make speculative investments. *Id.* Similarly, hedge funds often avoid the reach of securities regulations by making non-public offerings to "accredited investors," limiting the number of equity holders to less than five

hundred, and taking steps to fit within the legal definition of "traders" of securities rather than "brokers" or "dealers" pursuant to the Securities Exchange Act of 1934. Desmet, *supra*, at 15.

> ### b) Sufficient Facts Have Been Alleged such that the Foundation is Not Precluded From Asserting the Existence of a Fiduciary Duty.

Defendants maintain that another unique attribute of a hedge fund—the general lack of a fiduciary duty between hedge fund managers and the individual investors in the fund—supports dismissal of the Foundation's breach of fiduciary duty claim. (Docket No. 34, at 7-8). They reference two federal court decisions outside the Third Circuit addressing the scope of the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80a-1, *et seq*. (Docket No. 34, at 7). The Foundation responds that there is no *per se* rule that a hedge fund manager cannot owe a fiduciary duty to individual investors and that a fact-specific analysis is necessary to determine whether a fiduciary duty exists in this case. (Docket No. 37, at 6). Based on an examination of the decisional law on this point, the Court cannot ascertain the existence of any such *per se* rule and further finds that the Foundation is not barred from asserting that Defendants owed it a fiduciary duty.

The first case Defendants cite, *Goldstein v. S.E.C.*, held that the Securities and Exchange Commission ("SEC") could not issue a regulation specifying that hedge fund managers must "count as clients the shareholders, limited partners, members, or beneficiaries … of [the] fund" for purposes of the IAA.[7] 451 F.3d 873, 877, 883 (D.C. Cir. 2006) (alteration in original). In so ruling, the District of Columbia Circuit recognized that the IAA created a fiduciary duty of loyalty between an adviser and his client. *Id.* at 881 (citing *S.E.C. v. Capital Gains Research*

---

[7] The purpose of this new rule was to bring hedge funds within SEC regulation through the IAA. *See Goldstein*, 451 F.3d at 877 ("Concluding that its 'current regulatory program for hedge fund advisers [was] inadequate,' the [SEC] moved to require hedge fund advisers to register under the [IAA] so that it could gather 'basic information about hedge fund advisers and the hedge fund industry,' 'oversee hedge fund advisers,' and 'deter or detect fraud by unregistered hedge fund advisers.'") (citations omitted).

*Bureau, Inc.*, 375 U.S. 180, 191-92 (1963)). By implication, if hedge fund investors were clients of hedge fund advisers, then the IAA would impose fiduciary duty of loyalty between them. Given this potential outcome, the D.C. Circuit ultimately determined that a direct adviser-client relationship only existed between a hedge fund adviser and the hedge fund itself, not between the adviser and the investors in the fund. *Id.* at 880. This was because "[t]he adviser is concerned with the fund's performance, not with each investor's financial condition." *Id.* If the fiduciary duty of loyalty between investment advisers and their clients were applied in the context of advisers and investors of a hedge fund, then hedge fund advisers would "inevitably face conflicts of interest." *Id.* at 881. For example, if a hedge fund was facing bankruptcy, the investment adviser's advice to the fund itself would likely include any and all measures to remain solvent; in contrast, his advice to an investor in the fund would likely be to sell and recoup the remaining investment. *Id.* In light of the conflict of interest a hedge fund adviser would face when simultaneously serving the hedge fund and the hedge fund's investors, the D.C. Circuit concluded the SEC's regulation was unreasonable, arbitrary, and capricious. *Id.* at 882 (citing *Shays v. F.E.C.*, 414 F.3d 76, 96-97 (D.C. Cir. 2005)).

However, the D.C. Circuit left open the question of whether an investor can be considered a client under different factual circumstances. *See id.* at 883 (venturing that "[i]f there are certain characteristics present in some investor-adviser relationships that mark a 'client' relationship, then the [SEC] should have identified those characteristics and tailored its rule accordingly"). The court explained that the existence of an adviser-client relationship "depended largely on the character of the advice rendered" by the adviser and deemed a fiduciary, person-to-person relationship as being characteristic of the investment adviser-client relationship. *Id.* at 880 (citing *Lowe v. S.E.C.*, 472 U.S. 181 (1985)).

The second case Defendants cite is *S.E.C. v. Mannion*, in which a district court in the Northern District of Georgia adopted the reasoning used in *Goldstein* to hold that a fraud claim pursuant to the IAA could only be brought in a claim by a hedge fund rather than the fund's investors. 789 F. Supp. 2d 1321, 1338 (N.D. Ga. 2011). Although the SEC had argued that the hedge fund advisers created an adviser-client relationship with the fund's investors by seeking their consent to create a side pocket agreement, the court found that this single communication for a temporary change to the fund's operation did not support the inference that the investors became the advisers' clients. *Id.*

Following *Goldstein*, other federal courts have similarly acknowledged that a hedge fund manager does not have an adviser-client relationship with fund investors absent a showing that the fund adviser had a closer relationship with a particular investor. In *United States v. Lay*, which the Foundation references, the Sixth Circuit rejected the categorical argument that a hedge fund adviser owes no fiduciary duties to the various investors in the fund. 612 F.3d 440, 445-46 (6th Cir. 2010). The court agreed with the analysis in *Goldstein* and recognized that the decision "did not hold that no hedge fund adviser could create a client relationship with an investor, but rather held only that the SEC had 'not justified treating *all* investors in hedge funds as clients.'" *Id.* at 446-47 (emphasis in original). After reviewing the district court's recitation of evidence tending to show that the characteristics of an adviser-client relationship were present between the defendant adviser of the hedge fund and an investor, the Sixth Circuit affirmed the district court's decision to permit the question of whether the defendant owed a fiduciary duty to the investor to be presented before the jury in a criminal fraud case. *Id.* Among the evidence found to weigh in favor of an adviser-client fiduciary relationship was the investor's "single relationship with [the defendant]," the fact that the investor was the only entity investing in the

hedge fund at the relevant time, as well as the fact that the investor had an active role in the management of the fund as shown by the meetings with the defendant adviser. *Id.* at 446. Likewise, in *Goldenson v. Steffens*, a district court in Maine concurred that "[w]hether a fiduciary relationship existed remains a fact-specific inquiry." 802 F. Supp. 2d 240, 267 (D. Me. 2011). In that case, the court held that the allegations that the defendants had met with the plaintiffs individually, reviewed their personal investment objectives, recommended investments in funds tailored to their investment objectives, and promised to monitor the funds in their personal interests were sufficiently pled to surmount a motion to dismiss. *Id.* at 268. These rulings in *Lay* and *Goldenson* have been mimicked in cases where a party has presented some indicia of a close adviser-investor relationship absent from the traditional, impersonal hedge fund structure. *See, e.g.*, *S.E.C. v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012) (adviser-client fiduciary relationship was established because the defendant proffered advice directly to investors when hosting meetings and suggesting in the fund's newsletter that his market strategy could beat market returns); *S.E.C. v. Sentinem Mgmt. Grp., Inc.*, No. 07-4684, 2012 WL 1079961, at *13 (N.D. Ill. Mar. 30, 2012) (inclusion of client-specific investment guidelines that the defendant investment management company was bound to follow when making investment decisions on behalf of the investor and representation to investors that the company could customize their portfolios to meet each investor's particular needs demonstrated that "[the defendant] is not akin to a traditional hedge fund manager").

Following this precedent, the Court finds that there is no *per se* rule precluding breach of fiduciary duty claims by investors of hedge funds, such as the Foundation. Instead, the Court must evaluate the facts, as pled, to determine if they are nevertheless insufficient to permit a

cause of action for breach of fiduciary duty.[8] In this Court's estimation, however, the Foundation has pled sufficient facts indicating it had a closer relationship to Harley than the typical hedge fund adviser has with investors. The allegations in the Second Amended Complaint reveal that the Foundation was treated as a preferred investor on at least two occasions. At the outset of its investment in the hedge fund, it received a Side Letter that represented the Foundation could completely withdraw its money from the hedge fund at any time. (Docket No. 30-1, at 1). To the extent that the fund manager could have imposed liquidity restrictions on withdrawal requests as is the typical practice in hedge funds, this Side Letter purported to remove that discretion. Although Edward A. Schinik signed the Side Letter as the Chief Operating Officer on behalf of the Mellon Entities, (Docket No. 30, at ¶ 9), Harley was the fund manager and worked with the Mellon Entities during this time and this Side Letter was binding on him. *Id.* at ¶ 12. Moreover, the terms of this Side Letter were to be kept confidential between the parties and could not be modified without the express written consent of the Foundation. (Docket No. 30-1, at 1). Consent to alter or amend the Side Letter was never given. (Docket No. 30, at ¶ 27). This further supports the plausible inference that the accommodation was not made generally available to other investors in the hedge fund.

The Foundation was again treated with special care by Harley when he personally met with Foundation representative, Keating. Harley admitted that the hedge fund was having problems but agreed to treat the Foundation as if it had placed its redemption request in December 2007, when its account balance was at its maximum. *Id.* at ¶¶ 31, 48. In addition, he acknowledged that "if the matter had to be taken to Court the Foundation would stand first in

---

[8] It is undisputed that state law governs the substance of the Foundation's breach of fiduciary duty claim. Indeed, there is no reference to any substantive legal right generated by a federal statute in either the Second Amended Complaint or any of the Foundation's briefings. Nevertheless, the reasoning in *Goldstein* and subsequent federal cases are persuasive to this Court's determination of whether there exists a cognizable state-law claim for breach of fiduciary duty in this case.

line to recover before the other large investors." *Id.* at ¶ 48. It is logically impossible for more than one investor to stand first in line ahead of other investors or creditors following liquidation. Nor is it feasible for every investor to redeem the value of his or her investment as of the time the fund was at its largest. Such circumstances indicate the Foundation benefitted from uniquely preferential treatment.

In light of these accommodations and assurances Defendants specifically made to the Foundation, it is certainly plausible that they shared an adviser-client relationship to which a fiduciary duty could attach. As in *Goldenson*, Harley met with the Foundation individually to address its specific concerns about its investment. 802 F. Supp. 2d at 268. Defendants and their predecessors also made special promises they could not have kept if made to other investors. The Court therefore finds no deficiency in the Foundation's pleadings based on *Goldstein* or its progeny precluding its ability to bring a breach of fiduciary duty claim at this stage.

### c) Sufficient Facts Have Been Alleged to Indicate the Existence of a Fiduciary Relationship Pursuant to Pennsylvania Law.

Having determined that the Foundation's role as a hedge fund investor does not, by itself, prevent it from bringing a breach of fiduciary duty claim against Defendants, it must still plead sufficient facts tending to establish that they owed it a fiduciary duty pursuant to state law. As Judge Hornak recently noted, there are two ways to establish a fiduciary relationship under Pennsylvania law:

> First, it may be shown by demonstrating the existence of a relationship ordinarily known to be fiduciary as a matter of law, such as that between a "trustee and [beneficiary], guardian and ward, attorney and client, and principal and agent." Second, it may be established as a matter "of fact to be decided by evidence." The "disparity in position between the parties" is the key factor in determining whether a fiduciary-in-fact relationship developed between parties in an otherwise arm's-length business relationship.

*Reginella Constr. Co., Ltd. v. Travelers Cas. and Sur. Co. of Am.*, No. 12-1047, 2013 WL 2404140, at *9-10 (W.D. Pa. May 31, 2013) (quoting *Leedom v. Palmer*, 117 A. 410, 412 (Pa. 1922); *Weir by Gasper v. Ciao*, 521 A.2d 819, 825 (Pa. 1989)); *see also Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 577 (Pa. Super Ct. 2006) (discussing fiduciary duties resulting from agency relationships[9] as well as confidential special relationships) (citations omitted); *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 21-23 (Pa. Super. Ct. 2002) (same). A fiduciary duty premised on a confidential relationship between the parties attaches "wherever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Basile v. H & R Block, Inc.*, 777 A.2d 95, 102 (Pa. Super. Ct. 2001) (citing *Brooks v. Conston*, 51 A.2d 684, 688 (Pa. 1947)); *see also Le Bars v. UBS AG*, No. 12-424, 2013 WL 1819803, at *9 (W.D. Pa. Apr. 29, 2013) (Lenihan, C.M.J.) ("a fiduciary relationship exists where the parties have 'reposed a special confidence in each other to the extent that [they] do not deal with each other on equal terms'") (alteration in original) (quoting *Brandow Chrysler Jeep Co. v. Datascan Techs.*, 511 F. Supp. 2d 529, 538-39 (E.D. Pa. 2007)). However, not every relationship between one party paying and relying on the specialized skill or expertise of another party amounts to a *fiduciary* relationship. *eToll*, 811 A.2d at 23. The relationship must go beyond mere reliance on superior skill, such that one side possesses "overmastering influence" or the other side is in a position of "weakness, dependence or trust, justifiably reposed." *Basile*, 777 A.2d at 101 (citing *Frowen v.*

---

[9] A fiduciary duty can arise from a principal-agent relationship. *See Sutliff v.* Sutliff, 528 A.2d 1318, 1323 (Pa. 1987) ("An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit.") (citing RESTATEMENT (SECOND) OF AGENCY § 387 (1958)). The three basic elements of agency are: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (citing *Scott v. Purcell*, 415 A.2d 56, 60 (1980)); *Reid v. Ruffin*, 469 A.2d 1030, 1033 (Pa. 1983)). It is not clear that these elements have been alleged. Nevertheless, a principal-agent relationship is not necessary to ground the Foundation's breach of fiduciary duty claim under Pennsylvania law if it has sufficiently pled the existence of a confidential relationship.

*Blank*, 425 A.2d 412, 416-17 (Pa. 1981)); *see also Stillwagon v. Innsbrook Golf & Marina, LLC*, No. 11-1338, 2013 WL 1180312, at *8 (W.D. Pa. Mar. 20, 2013) (Hornak, J.) (same) (citing *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 401-02 (E.D. Pa. 2009)).

The Foundation alleges that Defendants have been and continue to exert exclusive control over its investment in the subject hedge fund. (Docket No. 30, at ¶¶ 12, 25, 28, 74, 79-81, 85). The Foundation has not claimed that it has ever been able to influence the manner in which Defendants used its money or otherwise direct their investment strategy. A number of transactions using assets from the hedge fund were conducted by Defendants without either the consent or knowledge of the Foundation. *Id.* at ¶¶ 22-24, 35, 76, 78-81, 86. The Foundation's continued lack of control over its investment is the very reason it has filed this action seeking the return of its money. *Id.* at ¶ 119. Treating the factual allegations as true and drawing all inferences in the Foundation's favor, as this Court must, it appears that Defendants possessed an overmastering influence over the Foundation, which was reliant on them to act with integrity. As such, the factual predicates underlying a confidential relationship may plausibly be inferred. *See Stillwagon*, 2013 WL 1180312, at *20 (a fiduciary relationship exists where a counterclaim defendant maintained substantial control of a company's finances, and breach of the resulting fiduciary duty was sufficiently pled based on allegations by the company that it detrimentally relied upon false representations as to the general and financial state of affairs). Accordingly, Defendants' motion to dismiss on the basis that they owe no cognizable fiduciary duty to the Foundation under Pennsylvania law is denied.

### 3. The Foundation Has Pled Sufficient Facts to Establish that Defendants' Statements Were the Proximate Cause for Its Injuries.

Defendants further attack the Foundation's assertions of fraud and negligent misrepresentation on the grounds that the Second Amended Complaint does not allege sufficient

facts to show that its claimed injury was proximately caused by their purported wrongdoing and because the Foundation did not enter into any detrimental transactions based on said misconduct. (Docket No. 34, at 9). In Pennsylvania, fraudulent misrepresentation and negligent misrepresentation claims both require showing that an injury was proximately caused by the misrepresentation at issue. To state a cause of action for fraud, the plaintiff must establish: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999); *accord Boureiz v. Carnegie Mellon University*, 585 F.3d 765, 772 (3d Cir. 2009) (same) (citations omitted). Negligent misrepresentation requires: (1) a duty owed by the defendant to the plaintiff; (2) a misrepresentation of material fact; (3) made under circumstances in which the misrepresenter ought to have known its falsity; (4) with an intent to induce another to act on it; and (5) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz*, 729 A.2d at 561; *accord Boureiz*, 585 F.3d at 772 (citing *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 554 (E.D. Pa. 2006)). The elements for fraudulent misrepresentation differ from the elements for negligent misrepresentation in that for the latter, the misrepresentation must concern a material fact, there must be an existence of a duty owed by one party to the other, and the speaker need not know the falsity of the representation. *See, e.g.*, *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 279 (Pa. 2005) (noting that negligent misrepresentation claims require the existence of a duty owed by one party to another); *Gibbs v. Ernst*, 647 A.2d 882, 891 (Pa. 1994) (for a claim of negligent misrepresentation, "the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation

into the truth of those words"); *De Joseph v. Zambelli*, 139 A.2d 644, 647-48 (Pa. 1958) (in the absence of fraud, a misrepresentation is actionable only if it was material); *Milliken v. Jacono*, 60 A.3d 133, 141 (Pa. Super. Ct. 2012) (quoting *Heritage Surveyors & Engineers, Inc. v. Nat'l Penn Bank*, 801 A.2d 1248, 1252 (Pa. Super Ct. 2002)); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 614 (3d Cir. 1991) (explaining that the materiality requirement "becomes important only when the misrepresentation was innocently made or when it involved a privileged failure to disclose").

With respect to the proximate causation element, the Foundation avers that "as a result of its reliance upon these misrepresentations [made at the June 25, 2008 meeting with Keating], the Foundation acted by staying the course rather than seeking immediate legal recourse, as the Foundation reasonably believed that Defendants would provide the Foundation with the preferential distribution that was represented." (Docket No. 30, at ¶ 151). Defendants specifically counter that Harley's alleged statements to Keating bear no relation to the damages claimed. (Docket No. 34, at 9). They argue that even if the Foundation sought immediate legal recourse, it would only be entitled to the value of its investment at the time of its redemption request, which is the same measure of damages as it now seeks in this action. (Docket No. 34, at 9).

Consistent with the pleading in the Second Amended Complaint regarding the Foundation's decision to "stay the course" and wait for distribution of its proceeds, the Foundation responds by insisting it "has been injured as Defendants claim to now have $60 million less in assets from which Plaintiff (and presumably many other investors) can seek to collect." (Docket No. 37, at 8). As alleged, the balance of the Foundation's account before the misrepresentations were made on June 25, 2008 was $306,376.75. (Docket No. 30, at ¶ 40). Since then, Defendants report that the investment value has dropped to $125,627.51 as of June

2012. *Id.* at ¶ 118. Although the Foundation apparently seeks to recover its entire initial investment, to the extent it is only entitled to the presently diminished value of its investment, the Foundation contends the delay in filing this lawsuit resulted in the loss of its ability to reclaim a substantial portion of its assets. (Docket No. 37, at 8).

The parties' briefs focus on the amount of potential damages the Foundation could have recovered had it exercised its prerogative to pursue legal relief at an earlier time. There is, however, a legally significant difference between a party's potential *damages* in a case and the *injury* that forms an essential element of a cause of action. As the Third Circuit explained in *Boureiz*, "only the latter is relevant to the proximate cause inquiry, for although the actions of a third party or other forces can mitigate or even eliminate the ultimate damages award, those forces do not change the fact of the initial injury and the cause of that injury." 585 F.3d at 772. While the Court recognizes that *Boureiz* permits the parties to make arguments about mitigation[10] of the ultimate damages award, neither party may conflate the concept of injury with that of expected damages. *Id.*

In accord with *Boureiz*, the Court focuses on whether the Foundation actually suffered a loss as a result of any alleged misrepresentations. It is undisputed that the Foundation maintained a financial stake in the hedge fund, which Defendants controlled and managed. To this day, the Defendants have not returned *any* of its money. (Docket No. 30, at ¶ 101). In this Court's estimation, construing the plaintiff's allegations in its favor, as the Court must, the continued withholding of money from the Foundation plausibly qualifies as an injury.

---

[10] Under Pennsylvania law, "'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.'" *Yost v. Union R.R. Co.*, 551 A.2d 317, 322 (Pa. Super. Ct. 1988) (quoting RESTATEMENT (SECOND) OF TORTS § 918(1) (1979)); *see also Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 264 (3d Cir. 2008) (in the context of a breach of contract claim, "the defendant is … entitled to offset his damages payment by the amount he can prove could have been avoided through plaintiff's reasonable efforts"); *Seber v. Daniels Transfer Co.*, 618 F. Supp. 1311, 1315 (W.D. Pa. 1985) (Weber, J.) ("a plaintiff cannot recover for damages which he reasonably could have avoided").

Nevertheless, the mere existence of a misrepresentation and a subsequent injury are not sufficient to establish actionable fraud or negligent misrepresentation. There must be a causal link between the two that is sufficiently proximate for the law to permit recovery. Proximate causation is found when a wrongful act is a "substantial factor" in bringing about the plaintiff's harm. *Boureiz*, 585 F.3d at 771; *accord Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super Ct. 2006) (same). Proximate cause does not exist where the causal chain of events resulting in the injury is so remote that the actor cannot be held legally responsible for the harm that subsequently occurred. *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. Ct. 1993). In determining whether the plaintiff has established proximate causation, Pennsylvania courts apply the factors listed in Restatement (Second) of Torts § 443:

> (a) the number of other factors which contribute to producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or a series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
> (c) lapse of time.

*Boureiz*, 585 F.3d at 771 (citing *Brown v. Phila. Coll. of Osteopathic Med.*, 760 A.2d 863, 869 (2000)).

The Foundation's apparent position is that if Harley had not made the misrepresentations or had told the truth, it would have sought immediate legal recourse. Thus, it reasons that Harley's misrepresentations caused it to refrain from filing or threatening to file a lawsuit, which, in turn, allowed Defendants to allegedly continue utilizing its investment funds unimpeded. (Docket No. 37, at 8). Taking these assertions as true, the Foundation has set forth sufficient facts to surmount the present motion to dismiss. As alleged, the misrepresentations were a

"substantial factor" in bringing about its inability to recover any of its assets from the hedge fund. The Foundation's decision not to pursue legal recourse for over a year was the product of repeated and ongoing misrepresentations, beginning at Harley's meeting with Keating and continuing thereafter in the form of numerous wind-down emails reporting that the hedge fund was being liquidated. Only after the final wind-down email was sent on June 29, 2009 did the Foundation discover that Defendants had absconded with its money. (Docket No. 30, at ¶¶ 62, 66-67). Nothing in the Second Amended Complaint indicates that any other factors were relevant in contributing to its injury. Thus, it is plausible that Defendants' actions directly caused the Foundation to "stay the course" to its detriment without any intervening break in the causal chain.[11] Although Defendants argue that no transactions were completed in reliance on any misrepresentations, (Docket No. 34, at 10), a misrepresentation can be tortious if it induces the victim to refrain from an action, such as the decision to forego legal recourse in this case. *See* RESTATEMENT (SECOND) OF TORTS § 525 (1977) (a tortfeasor can commit fraud by inducing a party to "refrain from action in reliance upon the misrepresentation").

Therefore, the Court denies the motion to dismiss on the basis of proximate causation. Following discovery, Defendants will again have an opportunity to challenge the legal sufficiency of the Foundation's fraudulent and negligent misrepresentation claims at the summary judgment stage.

### C. Federal Rule of Civil Procedure 12(f) Standard

The Court next turns to Defendants' motion to strike. Upon a motion by either party, the Court may strike any redundant, immaterial, impertinent, or scandalous matter from a pleading pursuant to Rule 12(f)(2) of the Federal Rules of Civil Procedure. The purpose of a Rule 12(f)

---

[11] Further, to the extent that Defendants wish to present a mitigation defense, they are not precluded from doing so. *See supra* note 10.

motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012) (McVerry, J.) (citation omitted). Motions to strike are not meant to determine disputed and substantial questions of law. *Tonka Corp v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 218 (D.N.J. 1993). In proceeding on a motion to strike for relevancy, the movant must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial. *Flanagan v. Wyndham Int'l, Inc.*, No. 2002/237-M/R, 2003 WL 23198798 (D.V.I. Apr. 21, 2003) (citing 2 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURES, § 1380); *River Rd. Dev. Corp. v. Carlson Corp.-Northeast*, No. 89-7037, 1990 WL 69085, at *7 (E.D. Pa. May 23, 1990) (the movant "must clearly show that the matter sought to be stricken is outside the issues in the case and is prejudicial" on a Rule 12(f)(2) motion). Prejudice occurs when the challenged pleading confuses the issues or is so lengthy and complex that it places an undue burden on the responding party. *See, e.g.*, *Goode v. LexisNexis Risk & Information Analytics Grp., Inc.*, 284 F.R.D. 238, 243 (E.D. Pa. 2012) (citing *River Rd. Dev. Corp.*, 1990 WL 69085, at *2); *Logan v. Krupp*, No. 08-869, 2009 WL 2929829, at *1 (S.D. Ill. 2009); *Anderson v. Bd. of Educ. Of City of Chicago*, 169 F. Supp. 2d 864, 868 (N.D. Ill. 2001). Motions to strike are decided on the pleadings alone. *Hanover Ins. Co. v. Ryan*, 619 F. Supp. 2d 127, 132 (E.D. Pa. 2007).

Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), *Thornton v. UL Enters.*, No. 09-287E, 2010 WL 1005021, at *2 (W.D. Pa. Mar. 16, 2010) (Cohill, J.), "striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record." *Dann v. Lincoln Nat. Corp.*, 274 F.R.D.

139, 142 (E.D. Pa. 2011); *see also Tennis v. Ford Motor Co.*, 730 F. Supp. 2d 437, 443 (W.D. Pa. 2010) (McVerry, J.) ("Striking some or all of a pleading is therefore considered a drastic remedy to be resorted to only when required for the purposes of justice.") (citation omitted). In deciding the motion, a court should also consider the liberal pleading standards of Rule 8 of the Federal Rules of Civil Procedure and the lack of a developed factual record at such an early stage of litigation. *Simmons*, 788 F. Supp. 2d at 407 (citations omitted). Accordingly, "such motions are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Dann*, 274 F.R.D. at 142-43 (citation omitted). A court will generally not grant such a motion unless the material to be stricken bears "no possible relationship to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.*, 629 F. Supp. 2d 416, 425 (D.N.J. 2009) (citations omitted).

### D. Analysis of Motion to Strike under Rule 12(f)

Defendants move to strike Paragraphs 11, 14, 15, 16, 20, 21, 37, 42, 60, 64, 71, 77, 83, 84, 89, 97, 98, 99, 102, 103, 115, 120 and Footnote 1 from the Second Amended Complaint for various reasons. (Docket No. 34, at 12). Paragraphs 14, 15, 16, 20, 21, 37, 42, 60, 64, 71, 77, and 89 pertain to Harley's various business ventures. The allegations in Paragraphs 11, 83, 84, 97, and 98 reference the involvement of an unnamed law firm that represented both the Foundation as well as Defendants at different stages in time without securing a conflict waiver. There are also allegations in Paragraphs 99, 102, 103, 115 and 120 attesting to Defendants' intransigent conduct in defending against this action and their refusal to return the Foundation's money. Finally, Footnote 1 contains information about a member of Defendant HBS and an ongoing fraud lawsuit against him filed by the Securities and Exchange Commission.

The Court is not convinced the challenged paragraphs of the Second Amended Complaint are so redundant, immaterial, impertinent, or scandalous that they should be stricken from the pleadings. None of the challenged pleadings relating to Harley's investments and transactions rise to the level of being "immaterial" or "impertinent." Instead, these pleadings directly deal with Harley's alleged misuse of hedge fund assets for his personal gain and are consistent with other pleadings that are not subjects of a motion to strike. *See* (Docket No. 30, at ¶¶ 22, 23, 35, 36, 76, 78-81, 92-95, 108-09). Nor are these allegations particularly scandalous, such that they "reflect cruelly upon the defendant's moral character," are "repulsive," or "detract from the dignity of the court." *Donnelly v. Commonwealth Fin. Sys.*, No. 07-1881, 2008 WL 762085, at *4 (M.D. Pa. Mar. 20, 2008) (citations omitted). Whether these suspect transactions are actually connected to the hedge fund is a question of fact that will likely be the subject of much discovery. Defendants have failed to demonstrate any prejudice whatsoever arising from the remaining challenged paragraphs. The Foundation's pleadings providing background information, the procedural history of this case, and its legal positions taking issue with the defense of this suit do not confuse the issues or place an identifiable undue burden on Defendants. Accordingly, the Court denies Defendants' motion to strike Paragraphs 11, 14, 15, 16, 20, 21, 37, 42, 60, 64, 71, 77, 83, 84, 89, 97, 98, 99, 102, 103, 115, 120 and Footnote 1.

### III. CONCLUSION

Based on the foregoing, Defendants' "Motion to Dismiss and Motion to Strike Immaterial, Impertinent, and Scandalous Allegations," (Docket No. [33]), is DENIED.

An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   June 5, 2013
cc/ecf:   All Counsel of Record